**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

GATEWAYS TO CHANGE, INC.

v.

C.A. NO.
(R.I. SUPERIOR CT. NO. C.A. 05-0956)

KATHLEEN SPANGLER, IN HER CAPACITY AS DIRECTOR OF THE RI DEPARTMENT OF MENTAL HEALTH, RETARDATION & HOSPITALS; AND THROUGH HER THE RI DEPARTMENT OF MENTAL HEALTH, RETARDATION & HOSPITALS

CA 05 120ML

PETITION FOR REMOVAL

**To:** ***The United States District Court for the District of Rhode Island***

1. Defendants, Kathleen Spangler, in her capacity as Director of the RI Department of Mental Health, Retardation & Hospitals; and Through her the RI Department of Mental Health, Retardation & Hospitals, are defendants in a civil action filed in the Providence County Superior Court entitled *Gateways to Change, Inc. v. Kathleen Spangler, et al*, *C.A. No. PC 05-0956.* Certified copies of the record from the Providence County Superior Court are attached hereto as Exhibit A.

2. The aforesaid action was commenced with the filing of a Summons and Complaint. Upon information and belief, this complaint was served on or about March 3, 2005.

3. That the above described action, as stated in plaintiffs' complaint, is one of which this court has original jurisdiction pursuant to the provisions of 28 U.S.C. §1331 and is one which may be removed to this court by the defendants pursuant to the provisions of 28 U.S.C. §1441(a)-(d).



(2)

Defendants,
By their attorney,

Marc DeSisto (km)

Marc DeSisto, Esq. #2757
DESISTO LAW
211 Angell Street
Providence, RI 02906
(401) 272-4442
Fax 272-9937
E-Mail: marc@desistolaw.com

## CERTIFICATION OF SERVICE

I hereby certify that a true copy of the within was mailed, postage prepaid on this 23rd day of March 2005 to:

Kathleen McDonald

Gary R. St. Peter, Esq.
St. Peter & Kasle
Four Richmond Square
Providence, RI 09203

Richard G. Galli, Esq.
224 Cindyann Drive
East Greenwich, RI 02818

# EXHIBIT A

STATE OF RHODE ISLAND
PROVIDENCE, SC

SUPERIOR COURT

GATEWAYS TO CHANGE, INC.

VS. C. A. NO. PC 05 - 0956

KATHLEEN SPANGLER, IN HER CAPACITY AS
DIRECTOR OF THE RI DEPARTMENT
OF MENTAL HEALTH, RETARDATION & HOSPITALS; AND THROUGH HER
THE RI DEPARTMENT OF MENTAL HEALTH, RETARDATION & HOSPITALS

## FIRST AMENDED COMPLAINT

### General Allegations as to Parties, Individuals and Entities

1. Gateways to Change, Inc. ("Gateways") is a private non-profit corporation, licensed by MHRH for over ten (10) years, and provides services to adults with developmental disabilities.

2. Kathleen Spangler ("Ms. Spangler") is the Acting Director of the Rhode Island Department of Mental Health Retardation & Hospitals ("MHRH") and former Chief of Staff to Katherine Power, the former Director of MHRH.

3. MHRH is a department of state government established pursuant to Chapter 40.1 of the General Laws of Rhode Island and, among other things, is charged with responsibility to fund, administer and coordinate a system of services for Rhode Island citizens with specific disabilities. Through its Division of Developmental Disabilities (DDD), MHRH issues licenses for programs in Behavioral Healthcare and Developmental Disabilities.

4. Lynda Kahn ("Ms. Kahn") is the Executive Director of MHRH's Division of Developmental Disabilities ("DDD").

5. Jane Hayward ("Ms. Hayward") currently serves as Managing Director of the Rhode Island Office of Health and Human Services ("OHHS"). She previously served as Director of the Rhode Island Department of Human Services ("DHS"), and also the Interim Director of the MHRH.

6. Katherine Power ("Ms. Power") is a former Director of MHRH, who was succeeded by Jane Hayward in her capacity as Interim Director of MHRH, who in turn was succeeded by Kathleen Spangler, the current Acting Director of MHRH.

7. Ms. Spangler and Ms. Hayward have maintained a close personal and professional friendship for many years.

SUPERIOR COURT
FILED
HENRY S. KINCH JR., CLERK
2005 MAR -3 P 12: 25

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## General Allegations as to Facts
## Based on Personal Knowledge or Upon Information and Belief

### Part One: an employee is fired

8. Ms. Kahn has held the title of Executive Director of DDD for over a decade. She has distinguished the State of Rhode Island by serving as President of the Board of Directors of the National Association of State Directors of Developmental Disabilities Services (NASDDS). Ms. Kahn currently serves on the NASDDS Board of Directors as Immediate Past-President.

9. During her tenure, Ms. Kahn has presided over a developmental disability system that is recognized as a national model. Rhode Island is a leader in improving services for people with developmental disabilities and has succeeded in shifting its system from one large state institution, The Ladd School, to a system that is community-based and includes private agencies running group homes or providing services to people in their own homes, apartments and communities.

10. From approximately 1995 through approximately August 2003, Ms. Kahn reported directly to Ms. Power, the Director of MHRH. During the last several years of Ms. Power's directorship of MHRH, Ms. Spangler served as Chief of Staff to Ms. Power and was directly involved in many matters relating to DDD and Ms. Kahn's management of DDD.

11. Prior to June 2003, Ms. Kahn was involved in the investigation of an allegation that a state employee had committed sexual abuse or assault on the female resident of a group home for developmentally disabled adults, operated by state employees in Hope Valley, Rhode Island.

12. As a partial result of that investigation, disciplinary proceedings were initiated against several state employees, including Robert Hayward, in his capacity as a supervisor connected with the group home where the sexual assault took place.

13. Mr. Hayward was accused of having failed to report his knowledge that one employee had alleged that another employee had molested a disabled woman in a state-controlled facility.

14. At some point during those proceedings, Ms. Kahn made the decision to terminate Mr. Hayward's employment

15. Ms. Kahn, Ms. Spangler and Ms. Power participated in discussions regarding these disciplinary matters as they made their way through the MHRH disciplinary and grievance processes.

16. At all times related to these events, Robert. Hayward was the husband of Jane Hayward. At all times related to these events, Ms. Hayward served as the acting or appointed Director of the Rhode Island Department of Human Services ("DHS").

17. Sometime prior to June 2003, Ms. Hayward attempted to influence the disciplinary process involving her husband by seeking the intervention and assistance of high-ranking

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

persons(s) in the Department of Administration. The Department of Administration is the department within the Executive Branch with administrative authority over all other Departments in the Executive Branch – including both MHRH and DHS.

18. During the investigation and disciplinary proceedings against Mr. Hayward, Ms. Spangler was Chief of Staff to the Director of MHRH, participated in discussions with Ms. Kahn and Ms. Power regarding the matter, and never voiced any objections to the manner in which these matters were proceeding -- until March 2003 -- when Ms. Hayward was nominated by Governor Carcieri to become Director of DHS.

19. In March 2003, during the Rhode Island Senate's confirmation hearing involving Ms. Hayward's nomination to be Director of DHS, Ms. Spangler approached Ms. Kahn outside the hearing room and finally expressed resentment because her friend's husband had been subjected to the disciplinary process. Ms. Spangler chastised Ms. Kahn: "I can't believe what you did to Jane."

20. Ms. Kahn responded by asserting that the matter relating to Mr. Hayward involved an attempt to cover up allegations of sexual assault against a group home resident, and that she had a legal obligation to proceed with the investigation and disciplinary proceedings no matter who was involved in the incident.

21. On March 4, 2003, the Rhode Island Senate confirmed Ms. Hayward as Director of DHS.

22. In June, 2003, the perpetrator of the assault was tried before a jury and convicted of first degree sexual assault.

23. During the trial in June, 2003, Robert Hayward testified that

- Mr. Hayward had in fact breached his duty to report the allegation of an assault; and
- Because of his delay in reporting the incident, at first Mr. Hayward was fired and later – after appealing his dismissal – the sanction was reduced to a suspension and demotion.

24. On June 30, 2003, Ms. Power resigned her position as Director of MHRH to assume a new position in the District of Columbia.

25. On August 7, 2003, Ms. Hayward was appointed by Governor Carcieri to serve as Interim Director of MHRH as well as Director of DHS.

26. Therefore, as of August 7, 2003, Ms. Kahn was required to report to Ms. Hayward.

27. Thereafter, Ms. Kahn's duties/responsibilities began to change in several respects, including her authority over disciplinary matters. Ms. Hayward directed that final decisions regarding disciplinary actions -- resulting from investigations of possible abuse and neglect by MHRH employees -- would rest with Ms. Hayward.

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**Part Two: the Taricani interview**

28. In both the earlier part and latter part of 2003, Gateways' management received reports that a male individual receiving services from Gateways -- a man fully functional cognitively and college-educated -- had developed a romantic and financial relationship with one of Gateways' female staff. While the first report to Gateways was an anonymous one, Gateways nevertheless reported the matter to the Office of Quality Assurance.

29. Later in the year, a second report involving this same matter was made, and an investigation was begun. Although Gateways reported the matter twice, an allegation was made that they had not reported it.

30. In addition, several other allegations were made against Gateways by disgruntled former staff – both to the Office of Quality Assurance and to a local television reporter, Jim Taricani.

31. While the investigation of these allegations against Gateways was taking place, Ms. Hayward agreed to the television reporter's request for an on-camera interview. She later expressed "surprise" that the reporter had asked her about the previously-disclosed matter involving a Gateways female staff person and an individual receiving services.

32. Ms. Hayward angrily confronted Ms. Kahn. She expressed anger at Ms. Kahn for not having "warned" her that this particular matter – which she apparently viewed as another "failure to report case" -- might come up in the interview. Ms. Kahn did not believe that Ms. Hayward should have been discussing ongoing investigations on television. Ms. Hayward insisted that the incident helped to prove that there was a lack of "control" within the department.

33. MHRH announced new "emergency regulations" in February 2004.

34. Ms. Kahn and Gateways became the "vehicles" by which, over the next 18 months, a stifling array of internal changes would unilaterally be imposed upon Ms. Kahn and her Division; and a suffocating series of MHRH audits/reviews of Gateways would be used in an effort to create the impression that DDD/MHRH was in need of "accountability" and that a new philosophy of "accountability" was going to be imposed by the new leadership at MHRH.

**Part Three: Spangler takes control of DDD**

35. On Friday, March 12, 2004, Governor Carcieri, by executive order, appointed Ms. Hayward to the position of Managing Director of the Governor's newly created Office of Health and Human Services ("OHHS").

36. On Friday, March 12, 2004, at the urging of Ms. Hayward, Governor Carcieri designated Ms. Spangler to the position of Acting Director of MHRH.

37. Therefore, as of March 12, 2004, Ms. Kahn was required to report directly to Ms. Spangler and Ms. Spangler reported directly to Ms. Hayward.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

38. On Tuesday, March 16, 2004, *The Providence Journal* reported that in a post-appointment interview regarding her new position, Ms. Hayward described the new approach that she intended to take with privately operated service providers with whom her departments had contracts:

> "...citing a very difficult fiscal environment, Hayward said that other priorities include *strengthening consequences for those who don't cooperate with our programs...*"

39. After her appointment as acting director, Ms. Spangler pursued a new management philosophy, whose code word was "accountability" but whose principal motivations were cost-cutting and control.

40. Spangler also apparently took advantage of her new position to prosecute a private grudge against Lynda Kahn over the treatment of Robert Hayward.

41. Despite Ms. Kahn's qualifications, her reputation, and nearly a decade of excellent service, Ms. Spangler was extremely hostile towards Ms. Kahn, resented the disciplinary "case" Ms. Kahn had pursued against Jane Hayward's husband Robert, and considered Ms. Kahn not to be a team player when it came to the plans that Ms. Spangler had for the Department.

42. Also in March, 2004 – less than two weeks after she became acting director of MHRH – Ms. Spangler issued an "Immediate Compliance Order" against Gateways.

43. A few days later the Department acknowledged in an April 7 letter that Gateways' "corrective action plan addressed all the required elements of the order" -- but that MHRH would nevertheless continue to monitor Gateways.

44. Since that time, Gateways has been subjected to unlawful and discriminatory treatment by MHRH, including the department's failure to adhere to its own regulations.

45. Ms. Spangler's mistreatment of Ms. Kahn and her mistreatment of Gateways began simultaneously and were both motivated at least in part by Ms. Spangler's desire to retaliate against Ms. Kahn for her discipline of Robert Hayward in a "failure to report" case; and Ms. Kahn's handling of the "failure to report" case involving Gateways.

46. In effectively demoting Ms. Kahn and pursuing hostile agency actions against Gateways, Ms. Spangler was prosecuting private grudges, as well as "sending a signal" about her new vision for the Department, and how she intended to deal with service providers.

**Part Three: the phantom "waiting list"**

47. As an example of Ms. Spangler's new management philosophy, whose code word was "accountability" but whose principal motivations were cost-cutting and control, she endorsed the

A True Copy, Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

establishment of a phantom "waiting list" whose purpose was to save money by slowing down services to people who were eligible for them.

48. Under Ms. Spangler's management, people with disabilities either had eligibility determinations slowed down, or if they had already been found eligible for services they were simply put on "hold" without funding – without telling them that they were on "hold," or even whether they had already been found eligible.

49. People who might have believed that their applications for service were delayed for routine bureaucratic reasons were unaware that they were already entitled to the services, but the funds to support them were not being released.

50. Gateways and other providers complained that a "waiting list" had, in fact, been created by MHRH – and that the list was growing.

51. Gateways and other providers began protesting this action, and suggested it might be a violation of federal and state law .

52. Within MHRH, Ms. Kahn and possibly others objected to the confidential "waiting list," not only because the Department was not providing the services to which disabled persons were entitled, but because staff were not allowed to inform disabled applicants who were "on the waiting list" that they were entitled to services.

53. Despite the protests of Gateways and others, MHRH officials denied the existence of any "waiting list," including, in early 2004, in testimony before the Rhode Island General Assembly.

54. Nevertheless, Ms. Spangler continued the "waiting list" practice and the list of individuals "waiting" for services for which they were otherwise eligible, mushroomed to over one hundred (100) disabled people by October 2004.

55. After MHRH was notified in late October 2004 that some organizations intended to file lawsuits over the "waiting list," Ms. Spangler finally announced that more than seventy individuals would be notified that they were eligible to receive services and that the funding had been authorized.

56. Immediately thereafter, a new "waiting list" was established by MHRH.

57. Ms. Spangler has denied that a "waiting list" ever existed or that a "waiting list" exists today.

58. In addition to Ms. Spangler's other grudges, she was hostile to Ms. Kahn because Ms. Kahn objected to the confidential "waiting list" that kept eligible disabled citizens "on hold" without providing the services to which they were entitled, and without informing the people whose lives were affected by the decision that put them on the "list."

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

59. Ms. Spangler considered Ms. Kahn a troublemaker, not a team player, because of Ms. Kahn's objection to the waiting list, among other things.

60. In the fall of 2004, Ms. Kahn was placed on extended medical leave of absence for work-related stress. While on leave, she was injured in a motor vehicle accident.

61. While Ms. Kahn was on medical leave, Ms. Spangler took steps to get rid of Ms. Kahn -- including cutting off Ms. Kahn's access to her staff.

62. Within hours of Ms. Kahn's return to work, Ms. Spangler announced that Ms. Kahn had been removed from the day-to-day operation of her Division, and that Ms. Kahn's staff no longer would report to her.

63. Ms. Spangler announced that Ms. Kahn still would retain her title as Executive Director; but instead of having executive, managerial and supervisory authority over programs and staff, Ms. Kahn would be relegated to "special projects" given to her at the discretion and direction of Ms. Spangler.

64. Based on a report published in *The Providence Journal*, it appears that MHRH wishes the public to believe that the "waiting list" problem first came to light while Ms. Kahn was out on leave – as if she were to blame for the problem, instead of having opposed it.

65. Ms. Spangler's hostility to Gateways has been motivated, at least in part, by Gateways' opposition to the "waiting list," for the same reasons shared by Ms. Kahn and others.

**Additional Allegations as to Gateways**

**Family Involvement: Ms. Spangler's hostility**

66. Following the self-report of an incident involving injury to a person receiving services, in January, 2005, Gateways was summoned to a meeting at which Ms. Spangler threatened to pursue sanctions if Gateways did not immediately submit to the takeover of a facility by another provider.

67. When Gateways asked if the families of the residents should be consulted, Ms. Spangler became enraged, accused Gateways of rabble rousing, and threatened sanctions if Gateways informed the families and sought their input on Ms. Spangler's decision.

68. Gateways was given the choice of submitting immediately to Ms. Spangler's demands – without family involvement in or opinion on her decision -- or the families would be subjected to the public and private trauma of an immediate hostile takeover by the state. Ms. Spangler treated family involvement as a hostile act, for which the families would be punished along with Gateways if an effort were made to involve them.

True Copy Attest:
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**The "Show Cause Hearing" Notice**

69. Ms. Spangler has served upon Gateways a document entitled "Notice of Show Cause Hearing," which calls for a litigation procedure that –

- has no support in the regulations;
- conflicts with the specific provisions that do exist in the regulations; and
- imposes on Gateways an unconventional process that effectively reverses the burden of proof in a license revocation proceeding

70. Normally, under the regulations, if MHRH wants to revoke a provider's license, MHRH must initiate a licensing action, and hold an evidentiary hearing, at which MHRH would have the burden of proof, and the provider would have procedural and evidentiary rights, as well as the right to an appeal under the Administrative Procedures Act. If the provider "won" that hearing, MHRH's license revocation or other sanctions could not be imposed.

71. However, Ms. Spangler's "Notice of Show Cause Hearing" contains this perverted order:

> ...pursuant to Rhode Island General Laws section 40.1-24-1 et. seq. and Rhode Island General Laws 43-35-9[1]...the Department is instructing Gateways to attend a Show Cause Hearing...on April 26, 2005 at 10 am, *to show cause why the Department shall* *__not__*, at that time, *__initiate__* a licensing action against Gateway's above enumerated licenses.

72. Under Ms. Spangler's newly-manufactured "Notice of Show Cause Hearing" process, she has scheduled an evidentiary hearing *before* initiating a licensing action. She decrees that this preliminary hearing will be held, with the provider having the burden of proving why she should *__not__* initiate a licensing action.

73. Not only has she attempted to shift the burden of proof to the provider, but she has used the "notice" to impose additional orders on the provider.

74. Gateways in effect must defend itself against charges that have not yet been filed, and suffer sanctions before the hearing, as if MHRH had already filed the charges and won the hearing that the rules require.

75. Ms. Spangler conceded recently that in some cases, the division operates on informal "in-house" rules that have never been properly codified. She has not yet conceded that doing so is unlawful.

76. During recent weeks, Gateways has been subjected to an increasingly aggressive series of notices, orders, instructions and other demands, many of which are issued either outside the normal regulatory process or in conflict with it.

[1] This section does not exist in the Rhode Island General Laws.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**Treatment of Quality Assurance Reports**

77. MHRH has taken the position that findings or analyses of its Quality Assurance staff are conclusive on the matters they refer to; that a licensee such as Gateways is not entitled to contest them; and that Ms. Spangler may rely on staff determinations in issuing orders and notices, without according the licensee due process and the right to participate at an evidentiary hearing on those determinations. The "Notice of Show Cause Hearing" received by Gateways is an example.

78. In addition, MHRH has engaged in a pattern and practice of fact-manipulation at the provider level. Providers such as Gateways and others are, in some circumstances, properly required to report "incidents" to MHRH's Quality Assurance staff. The providers also are properly required to conduct their own internal investigations and make their own findings.

79. However, providers have been contacted by MHRH staff, who *improperly* insist that the results of the providers' own investigations be changed to coincide with the position taken by MHRH. In this way, MHRH has tried not only to strip the providers of their right to *defend* against an allegation, but also their right to have a different *opinion* about it.

**The ISP Issue**

80. Not all clients are receiving 24 hour care. For many clients MHRH funds specific services for a limited number of hours per week. The scope of services that must be provided to a client is contained in his or her Individualized Service Plan ("ISP").

81. It appears, however, that MHRH staff may claim "violations" by the licensee without regard to a client's Individualized Service Plan – as if the client were entitled to comprehensive 24-hour care regardless of limitations in the Individualized Service Plan – or limitations in state funding.

**Interference with the right to counsel**

82. MHRH has summoned Gateways to meetings, but has insisted that Gateways attend without legal counsel; that the meeting will be cancelled if counsel attend; and/or that the matter will proceed to sanctions if the meeting is not held on MHRH's terms. Based on information and belief, this practice is occurring with other providers as well.

83. Because MHRH's conduct has been outside of and in contravention of the proper regulatory and administrative processes, Gateways is without an adequate administrative remedy and is in need of the Court's injunctive and other relief.

True Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## Count I
## Declaratory Judgment

83. We request that the Court enter a judgment declaring that –

- The "Notice of Show Cause Hearing" is null, void, and of no force or effect, as is every notice, instruction, order or demand issued within it or as a consequence of its issuance.
- Any so-called "in house" rules or regulations that have not been properly codified are null, void, and of no force or effect, as is every notice, instruction, order or demand contained within them, or issued as a consequence of their use.
- Any so-called findings, analyses or other opinions rendered by the MHRH staff, including its Quality Assurance staff, shall not be deemed conclusive on any issue adverse to a licensee without providing due process, including an opportunity to participate in an evidentiary hearing.

## Count II
## Mandamus and/or Injunction

84. We request that the Court enter a judgment and order that –

- MHRH be restrained and enjoined from holding hearings, entering orders, or otherwise enforcing or attempting to enforce any part of the so-called "Notice of Show Cause Hearing" that was served on Gateways by Kathleen Spangler.
- MHRH be restrained and enjoined from requiring Gateways or any other provider to comply with so-called "in-house" rules or regulations that have not properly been codified or promulgated.
- MHRH be ordered to comply with its lawfully-adopted rules and regulations, including without limitation those that are applicable to license modification and revocation, and compliance orders.
- MHRH be ordered to provide licensees with a lawfully sufficient due-process right to defend against any so-called findings, analyses or other opinions rendered by the MHRH staff, including an opportunity to participate in an evidentiary hearing.
- MHRH be ordered to provide the licensee with notice in writing describing (a) the regulations that have been violated and (b) the portions of the Individualized Service Plan that have not been fulfilled and (c) the specific conduct constituting the alleged violation, in each case where violations are alleged or compliance orders are sought or entered, or staff findings or opinions are filed adverse to a licensee.
- MHRH be ordered to cease and desist instructing licensees that they must not bring legal counsel to meetings with MHRH staff, or conditioning a meeting on the licensee's agreement not to involve counsel.
- MHRH cease and desist ordering licensees to alter their internal investigation records, including their internal findings or opinions as to any matter in issue.

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**Count III**
**Due Process**

85. Pursuant to RIGL § 40.1-24-9, MHRH is authorized and required to adopt and enforce rules, regulations, and standards with respect to all facilities and programs licensed by MHRH.

86. Pursuant to MHRH/DDD's own Regulations, a provider's license

> ...will stay in effect until the Department takes action to revoke it and the agency has had due process.

87. Pursuant to RIGL § 40.1-24-7 (Denial, suspension, or revocation of license) –

> The department, *after notice and opportunity for a hearing* to the applicant or licensee, is authorized to deny, suspend, or revoke a license in any case in which it finds that there has been failure to comply with *the requirements established under this chapter*. The notice shall be effected by registered or certified mail or by personal service, setting forth the particular reasons for the proposed action and fixing a date not less than thirty (30) days from the date of the mailing or service, at which the applicant or licensee shall be given an opportunity for a prompt and fair hearing. On the basis of any hearing, or upon default of the applicant or licensee, the department shall make a determination specifying its findings of fact and conclusions of law. A copy of the determination shall be sent by registered or certified mail or served personally upon the applicant or licensee. The decision denying, suspending, or revoking the license or application shall become final thirty (30) days after it is so mailed or served, unless the applicant or licensee, within the thirty day period, appeals the decision to the superior court, pursuant to § 40.1-24-8. *The procedure governing hearings authorized by this section shall be in accordance with rules promulgated by the department.* A full and complete record shall be kept of all proceedings, and all testimony shall be reported but need not be transcribed unless the decision is appealed pursuant to § 40.1-24-8. A copy or copies of the transcript may be obtained by any interested party on payment of the cost of preparing the copy or copies. Witnesses may be subpoenaed by either party.

88. In pursuing a licensing action against Gateways, the Department has (among other things) invented a new "Notice of Show Cause Hearing" process which is unlawful and discriminatory.

89. Gateways has been denied its right of due process of the law, in derogation of the statutes and regulations that govern MHRH's jurisdiction and authority; and in derogation of our rights under the Rhode Island and United States Constitutions.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**Count IV**
**Equal Protection**

90. To the extent that Gateways has been subjected to rules, regulations, processes and standards that have not been applied to other licensees, Gateways has been denied its right of equal protection, in derogation of the statutes and regulations that govern MHRH's jurisdiction and authority; and in derogation of our rights under the Rhode Island and United States Constitutions.

**Count V**
**Taking Without Just Compensation**

91. The actions of MHRH are an attempt to destroy or impair Gateways' interest in its licenses, and constitute a taking of private property without just compensation.

92. Gateways' claim for damages is within the jurisdictional limit of the Superior Court.

*Wherefore,* we request that the Court enter such judgments, orders, and writs as are necessary and proper, together with an award of our costs of suit.

**WE CLAIM A RIGHT TO TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

**Gateways to Change, Inc.,** by its Attorneys

**Richard G. Galli, Esq.** 1747
*Designated Trial Counsel*
*Of counsel* to St. Peter & Kasle Incorporated
Four Richmond Square
Providence, RI 02906
Phone 401 4534330 / Fax 453 4333

**Gary R. St. Peter, Esq.** 1672
St. Peter & Kasle Incorporated
Four Richmond Square
Providence, RI 02906
Phone 401 4534330 / Fax 453 4333

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

Accepted Service 3/3/05

# State of Rhode Island and Providence Plantations
## SUPERIOR COURT

[x] PROVIDENCE/BRISTOL [ ] KENT [ ] WASHINGTON [ ] NEWPORT

CIVIL ACTION, FILE No. PC05-0956

Gateways To Change, Inc.
Plaintiff

Kathleen Spangler, In Her Capacity As Director Of The RI Department Of Mental Health, Retardation & Hospitals And The RI Department Of Mental Health, Retardation & Hospitals
Defendant

**Summons**

*To the above-named Defendant:*

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon Richard Galli Plaintiff's attorney, whose address is c/o St. Peter & Keale, Four Richmond Square, Providence, RI 029 an answer to the complaint which is herewith served upon you within 20 days after service of this summons upon you, exclusive of the day of service.

If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint. Your answer must also be filed with the court.

As provided in Rule 13(a) unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

CLERK

Dated: February 24, 2005

(Seal of the Superior Court)

A TRUE COPY ATTEST
ALFRED J. HARRIS
CONSTABLE # 6060
DATE: 3-3-05

RHODE ISLAND JUDICIAL SYSTEMS AND SCIENCES DATE 03/02/2005

SUPERIOR COURT CIVIL INFORMATION SYSTEM

DOCKET EVENT LISTING

CASE NO.: PC2005 0956 TYPE INJUNCTIVE RELIEF
TITLE: GATEWAYS TO CHANGE INC V KATHLEEN SPANGLER
FILING DATE: 02-25-2005 ASSIGNED TO TRIAL POOL:
DESIGNATED TO ARBITRATION:

| | | | |
|---|---|---|---|
| GATEWAYS TO CHANGE INC | BPL | Galli, Richard G | AOR |
| RI DEPT OF MENTAL HEALTH | BDF | Unknown, Attorney | AOR |
| SPANGLER, KATHLEEN DIRECTO | DEF | Unknown, Attorney | AOR |

| DOC. ID. | DATE | JUDGE | OUTCOME | EFFECTIVE DATE |
|---|---|---|---|---|

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

# CIVIL CASE COVER SHEET

## STATE OF RHODE ISLAND SUPERIOR COURT

Case * (Filled in by Clerk's Office) 05-0956

This form must be filed with each original document that comences a civil proceeding in the Clerk's Office (R.P.3.11). If the case is a District Court appeal. The form must be filed with the appeal in the District Court and will be transferred with other documents to the Superior Court.

**PLAINTIFFS:**
Gateways To Change Inc.

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**DEFENDANTS:**
Kathleen Spangler, In Her Capacity As Director Of The RI Department Of Mental Health Retardation & Hospitals; And The RI Department Of Mental Health, Retardation & Hospitals

**NATURE OF PROCEEDING**—Check the applicable case type under main categories listed below. (check one only)

District Court Appeal ☐ Yes (check type below)

- ☐ AGA Agency appeal
- ☐ ALA Alienation of affection
- ☐ ANT Anti-trust
- ☐ ASB Assault and battery
- ☐ BKA Book account
- ☐ CLA Common law assignment
- ☐ CLL Common law lien
- ☐ CON Contract
- ☐ CNV Conversion
- ☐ CRC Criminal conversation
- ☐ CIC Criminal inj. compensation
- ☐ DOJ Debt on judgment
- ☐ DTP Deceptive trade practice
- ☐ DEJ Declaratory judgment
- ☐ DPC Denial of probate claim
- ☐ EXT Excessive tax
- ☒ INR Injunctive relief
- ☐ IPL Interpleader
- ☐ LIB Libel/slander
- ☐ MLE Malpractice/legal
- ☐ MME Malpractice/medical
- ☐ MOT Malpractice/other
- ☐ WOM Mandamus. Writ of
- ☐ PRT Partition
- ☐ PER Personal injury
- ☐ IDV Personal inj./property dam-vehicle
- ☐ PIV Personal injury-vehicle
- ☐ PRL Product liabilty
- ☐ PRN Promissory note
- ☐ PDM Property damage
- ☐ PDV Property damage / vehicle
- ☐ RLP Real property
- ☐ RIC Reinstate charter
- ☐ DIN Recovery of damages/insurance
- ☐ ROF Recovery of funds
- ☐ WOR Replevin, writ of
- ☐ SPP Specific performance
- ☐ TCO Title clearing (other than tax title)
- ☐ TAE Trespass and ejectment
- ☐ TRA Trustee/accounting
- ☐ TCT Trustee/appt convey title
- ☐ UNM Uninsured motorist
- ☐ WRD Wrongful death

☐ Other than above (specify type):

### MISCELLANEOUS PETITIONS

- ☐ ARA Arbitration award
- ☐ CAR Arbitration /confirm
- ☐ RTA Arbitration referral
- ☐ VAR Arbitration / vacate
- ☐ AOD Assessment of damages
- ☐ CND Condemnation
- ☐ CFC Confirm compromise
- ☐ DOC Dissolution of corp.
- ☐ EDP End partnership
- ☐ FRR Forclosure of right redemption
- ☐ TLF Foreclosure / tax lien
- ☐ FOC Forfeiture of charter
- ☐ GJI Grand jury investigation
- ☐ HAC Habeas corpus
- ☐ MAW Material witness
- ☐ MEL Mechanics lien
- ☐ OSW Out of state witness
- ☐ PFS Perform surgery
- ☐ PFC Petition for constable
- ☐ PTE Petition to expunge
- ☐ PFI Petition for immunity
- ☐ PIN Pet for inventory (wire tap)
- ☐ PFR Petition for review
- ☐ PTD Pet to take deposition
- ☐ PCR Post conviction relief
- ☐ REC Receivership
- ☐ R5A Rule 5A petition
- ☐ TCL Title clearing (tax title)
- ☐ AOT Trustee / appointment of
- ☐ DOT Trustee / declination of
- ☐ AOS Trustee successor

☐ Other than above (specify type):

### PROBATE APPEALS

- ☐ WIL Will
- ☐ TRS Trust
- ☐ GRD Guardianship
- ☐ NAC Name change

☐ Other than above (specify type):

SUPERIOR COURT
FILED
HENRY S. KINCH JR., CLERK
2005 FEB 25 P 12:44

Is this a case that may require a trial for resolution? ☒ Yes ☐ No. If yes: ☐ Jury or ☒ Non-jury

( Attorney name ) (Date)
Richard Galli, c/o St. Peter & Kasle, Inc., Four Richmond Square, Providence, RI 02906
February 24, 2005

SC-223

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**STATE OF RHODE ISLAND** **SUPERIOR COURT**
**PROVIDENCE, SC**

**GATEWAYS TO CHANGE, INC.**

**VS.** **C. A. NO.** 05-956

**KATHLEEN SPANGLER, IN HER CAPACITY AS
DIRECTOR OF THE RI DEPARTMENT
OF MENTAL HEALTH, RETARDATION & HOSPITALS; AND THROUGH HER
THE RI DEPARTMENT OF MENTAL HEALTH, RETARDATION & HOSPITALS**

## COMPLAINT

### General Allegations as to Parties, Individuals and Entities

1. Gateways to Change, Inc. ("Gateways") is a private non-profit corporation, licensed by MHRH for over ten (10) years, and provides services to adults with developmental disabilities.

2. Kathleen Spangler ("Ms. Spangler") is the Acting Director of the Rhode Island Department of Mental Health Retardation & Hospitals ("MHRH") and former Chief of Staff to Ms. Katherine Power, the former Director of MHRH.

3. MHRH is a department of state government established pursuant to Chapter 40.1 of the General Laws of Rhode Island and, among other things, is charged with responsibility to fund, administer and coordinate a system of services for Rhode Island citizens with specific disabilities. through its Division of Developmental Disabilities (DDD), MHRH issues licenses for programs in Behavioral Healthcare and Developmental Disabilities.

4. Lynda Kahn ("Ms. Kahn") is the Executive Director of the Division of Developmental Disabilities.

5. Jane Hayward ("Ms. Hayward") is the former Director of the Rhode Island Department of Human Services ("DHS"), former Interim Director of the MHRH, and currently serving as Managing Director of the Rhode Island Office of Health and Human Services ("OHHS").

6. Katherine Power ("Ms. Power") is the former Director of MHRH, who was succeeded by Jane Hayward in her capacity as Interim Director of MHRH, who thereafter was succeeded by Kathleen Spangler, the current Acting Director of MHRH.

7. Ms. Spangler and Ms. Hayward have maintained a close personal and professional friendship for many years.

SUPERIOR COURT
FILED
HENRY S. KINCH JR., CLERK
2005 FEB 25 P 12: 34



INR
YN
1747

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## General Allegations as to Facts Based on Personal Knowledge or Upon Information and Belief

## Kahn / Hayward / Spangler Connection Part One

8. Ms. Kahn has held the title of Executive Director of DDD/MHRH for over a decade. She has distinguished the State of Rhode Island by serving as President of the Board of Directors of the National Association of State Directors of Developmental Disabilities Services (NASDDS). Ms. Kahn currently is serving on the NASDDS Board of Directors as Immediate Past-President.

9. During her tenure, Ms. Kahn has presided over a developmental disability system that is recognized as a national model. Rhode Island is a leader in improving services for people with developmental disabilities and has succeeded in shifting its system from one large state institution, The Ladd School, to a system that is community-based and includes private agencies running group homes or providing services to people in their own homes, apartments and communities.

10. From approximately 1995 through approximately August 2003, Ms. Kahn reported directly to Ms. Power, the Director of MHRH. During the last several years of Ms. Power's directorship of MHRH, Ms. Spangler served as Chief of Staff to Ms. Power and was directly involved in many matters relating to DDD/MHRH and Ms. Kahn's management of DDD/MHRH.

11. Prior to June 2003, Ms. Kahn was involved in the investigation of an allegation that a state employee had committed sexual abuse or assault on the female resident of a group home for developmentally disabled adults, operated by state employees in Hope Valley, Rhode Island.

12. As a partial result of that investigation, disciplinary proceedings were initiated against a state employee – Robert Hayward -- in his capacity as a supervisor connected with the group home where the sexual assault took place. Mr. Hayward was accused of having failed to report his knowledge of the allegations of sexual assault by a state employee upon a disabled woman in state care and under his supervisory control.

13. Ms. Kahn, Ms. Spangler and Ms. Power participated in discussions regarding these disciplinary matters as they made their way through the MHRH disciplinary processes.

14. At all times related to these events, Robert. Hayward was the husband of Jane Hayward. At all times related to these events, Ms. Hayward was the Director of the Rhode Island Department of Human Services ("DHS"), either in her capacity as Acting Director of DHS or in her capacity as Director of DHS.

15. Sometime prior to June 2003, Ms. Hayward attempted to influence the DDD/MHRH disciplinary process involving her husband by seeking the intervention and assistance of high-ranking persons(s) in the Department of Administration. The Department of Administration is the department within the Executive Branch with administrative authority over all other Departments in the Executive Branch – including both MHRH and DHS.

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

16. The perpetrator was eventually tried before a jury and convicted of sexual assault. During the trial, Robert Hayward testified that

- He had in fact breached his duty to report the allegation of an assault; and
- Because of his delay in reporting the incident, at first he was fired and later – after appealing his dismissal – the sanction was reduced to a suspension and demotion.

17. At all times during the DDD/MHRH investigation and disciplinary proceedings against Mr. Hayward, Ms. Spangler was Chief of Staff to the Director of MHRH, participated in discussions with Ms. Kahn and Ms. Power regarding the matter and never voiced any objections to the manner in which these matters were proceeding -- until March 2003 -- when Ms. Hayward was nominated by Governor Carcieri to become Director of DHS.

18. In March 2003, during the Rhode Island Senate's confirmation hearing involving Ms. Hayward's nomination as Director of DHS, Ms. Spangler approached Ms. Kahn outside the hearing room and finally expressed her resentment because her friend's husband had been subjected to the disciplinary process. Ms. Spangler chastised Ms. Kahn: "I can't believe what you did to Jane."

19. Ms. Kahn responded by asserting that the matter relating to Mr. Hayward involved an attempt to cover up allegations of sexual assault against a group home resident, and that she had a legal obligation to proceed with the investigations and disciplinary proceedings no matter who was involved in the incident.

20. On March 4, 2003, the Rhode Island Senate confirmed Ms. Hayward as Director of DHS.

21. On June 26, 2003, Mr. Gardiner, after a trial before a jury, was convicted of first-degree sexual assault. During the trial, Mr. Hayward testified that he had, in fact, breached his obligation and duty to report the allegation of a sexual assault. He also testified that because of his delay in reporting the incident of sexual assault, he originally was fired by DDD/MHRH, but that later the sanction was reduced to a suspension and demotion.

## The Hayward / Spangler / Kahn Connection

## Part Two

22. In June, 2003, Robert Hayward testified in the criminal trial of the sexual assault perpetrator.

23. On June 30, 2003, Ms. Power resigned her position as Director of MHRH to assume a new position in the District of Columbia.

24. On August 7, 2003, Ms. Hayward was appointed by Governor Carcieri to serve concurrently as Interim Director of MHRH and Director of DHS.

25. Therefore, as of August 7, 2003, Ms. Kahn was required to report to Ms. Hayward.

26. Thereafter, Ms. Kahn's duties/responsibilities began to change in several respects, including, among others, those relating to disciplinary matters involving employees. Ms. Hayward directed that final decisions regarding disciplinary actions resulting from investigations of possible abuse and neglect by DDD/MHRH employees would rest with Ms. Hayward.

27. In both the earlier part and latter part of 2003, Gateways' management received reports that a male individual who receiving services from Gateways -- a man fully functional cognitively and college-educated -- had developed a romantic and financial relationship with one of Gateways' female staff. While the first report to Gateways was an anonymous one, Gateways nevertheless reported the matter to the Office of Quality Assurance.

28. Later in the year, a second report involving this same matter was made, and an investigation was begun. In addition, several other allegations were made against Gateways by disgruntled former staff – both to the Office of Quality Assurance and to a local television reporter, Jim Taricani.

29. While the investigation of these allegations against Gateways was taking place, Ms. Hayward agreed to the television reporter's request for an on-camera interview. She later expressed "surprise" that the reporter had asked her about the previously-disclosed matter involving a Gateways female staff person and an individual receiving services.

30. Ms. Hayward angrily confronted Ms. Kahn. She expressed anger at Ms. Kahn for not having "warned" her that this particular matter might come up in an on-camera interview. Ms. Kahn did not believe that Ms. Hayward should have been discussing ongoing investigations on television. Ms. Hayward insisted that the incident helped to prove that there was a lack of "control" within the department.

31. MHRH announced new "emergency regulations" in February 2004.

32. Ms. Kahn and Gateways now became the "vehicle" by which, over the next 18 months, a stifling array of internal changes would unilaterally be imposed upon Ms. Kahn, and a suffocating series of MHRH audits/reviews of Gateways would be used in an effort to create the impression that DDD/MHRH was in need of "change" and that "change" was going to be imposed by the new leadership at MHRH.

**Kahn / Hayward / Spangler Connection**

**Part Three**

33. On Friday, March 12, 2004, Governor Carcieri, by executive order, appointed Ms.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

34. Hayward to the position of Managing Director of the Governor's newly created Office of Health and Human Services ("OHHS").

35. On Friday, March 12, 2004, at the urging of Ms. Hayward, Governor Carcieri also designated Ms. Spangler to the position of Acting Director of MHRH.

36. Therefore, as of March 12, 2004, Ms. Kahn was required to report directly to Ms. Spangler and Ms. Spangler reported directly to Ms. Hayward.

37. On Tuesday, March 16, 2004, the Providence Journal reported that in a post-appointment interview regarding her new position, Ms. Hayward described the new approach that she intended to take with privately operated service providers with whom her departments had contracts:

> "…citing a very difficult fiscal environment, Hayward said that other priorities include *strengthening consequences for those who don't cooperate with our programs…*"

38. After her appointment as acting director, Ms. Spangler pursued a new management philosophy, whose code word was "accountability" but whose principal motivations were cost-cutting and control.

39. Spangler also apparently took advantage of her new position to prosecute a private grudge against Lynda Kahn.

40. Despite Ms. Kahn's qualifications, her reputation, and nearly a decade of excellent service, Ms. Spangler was extremely hostile towards Ms. Kahn, resented the disciplinary "case" Ms. Kahn had pursued Jane Hayward's husband Robert, and considered Ms. Kahn not to be a team player when it came to the plans that Ms. Spangler had for the Department.

**Kahn / Hayward / Spangler / Connection**
**Part Four**

41. In the fall of 2004, Ms. Kahn was placed on extended medical leave of absence for work-related stress. While on leave, she was injured in a motor vehicle accident.

42. While Ms. Kahn was out on medical leave, Ms. Spangler took steps to get rid of Ms. Kahn -- including cutting off Ms. Kahn's access to her staff.

43. Within hours of Ms. Kahn's return to work, Ms. Spangler announced that Ms. Kahn had been removed from the day-to-day operation of DDD/MHRH and that DDD/MHRH staff no longer would report to her. Ms. Spangler announced that Ms. Kahn still would retain her title as Executive Director of DDD/MHRH; but instead of having executive, managerial and supervisory authority over programs and staff, Ms. Kahn would be relegated to "special projects" given to her at the discretion and direction of Ms. Spangler.

Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

A True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**Specific Allegations as to Gateways**

44. In March, 2004 – less than two weeks after she became acting director of DDD – Ms. Spangler issued an "Immediate Compliance Order" against Gateways. A few days later the Department acknowledged in an April 7 letter that Gateways' "corrective action plan addressed all the required elements of the order" but that DDD would continue to monitor Gateways.

45. Since that time, Gateways been subjected to unlawful and discriminatory treatment by DDD, including the department's failure to adhere to its own regulations.

46. Under the guise of regulation enforcement, Gateways has been ordered by Ms. Spangler to "comply" with standards and requirements which are not contained in the regulations. Gateways has been singled out for unequal treatment under the law, and is being deprived of due process of law.

47. As an example, following the self-report of an incident involving injury to one of the persons receiving services, in January 2005 Gateways was summoned to a meeting at which Ms. Spangler threatened to pursue sanctions if Gateways did not immediately submit to the takeover of a facility by another provider.

48. When Gateways asked if the family of the residents should be consulted, Ms. Spangler became enraged, accused Gateways of rabble rousing, and threatened sanctions if Gateways informed the families and sought their input on Ms. Spangler's decision. Gateways was given the choice of submitting immediately to Ms. Spangler's demands – without asking for family involvement in or opinion on the decision -- or subjecting the families to the public and private trauma of an immediate hostile takeover by the state. Ms. Spangler treated family involvement as a hostile act, for which the families would be punished along with Gateways if an effort was made to involve them.

49. As another example, Gateways has been served with a document entitled "Notice of Show Cause Hearing," which calls for a litigation procedure that –

- has no support in the regulations;
- conflicts with the specific provisions that do exist in the regulations; and
- imposes on Gateways an unconventional process that effectively reverses the burden of proof in a license revocation proceeding

50. Normally, under the regulations, if DDD wants to revoke a provider's license, DDD must initiate a licensing action, and hold an evidentiary hearing, at which DDD would have the burden of proof, and the provider would have procedural and evidentiary rights, as well as the right to an appeal under the Administrative Procedures Act. If the provider "won" that hearing, DDD's license revocation or other sanctions could not be imposed.

51. However, Ms. Spangler's "Notice of Show Cause Hearing" contains this perverted order:

> ...pursuant to Rhode Island General Laws section 40.1-24-1 et. seq. and Rhode Island General Laws 43-35-9[1]...the Department is instructing Gateways to attend a Show Cause Hearing...on April 26, 2005 at 10 am, *to show cause why the Department shall not*, at that time, *initiate* a licensing action against Gateway's above enumerated licenses.

52. Under Ms. Spangler's newly-manufactured "Notice of Show Cause Hearing" process, she has scheduled an evidentiary hearing *before* initiating a licensing action. She decrees that this preliminary hearing will be held, with the provider having the burden of proving why she should *not* initiate a licensing action. Not only has she attempted to shift the burden of proof to the provider, but she has actually used the "notice" to impose additional orders on the provider. Gateways in effect must defend itself against charges that have not yet been filed, and suffer sanctions before the hearing, as if DDD had already filed the charge and won the hearing that the rules require.

53. Ms. Spangler conceded recently that in some cases, the division operates on informal "in-house" rules that have never been properly codified. She has not yet conceded that doing so is unlawful.

54. During recent weeks, Gateways has been subjected to an apparently endless and increasingly aggressive series of notices, orders, instructions and other demands, many of which are issued either outside the normal regulatory process or in conflict with it.

55. Furthermore, MHRH has taken the position that findings or analyses of its Quality Assurance staff are conclusive on the matters they refer to; that a licensee such as Gateways is not entitled to contest them; and that Ms. Spangler may rely on staff determinations in issuing orders and notices, without according the licensee due process and the right to participate at an evidentiary hearing on those determinations. The "Notice of Show Cause Hearing" received by Gateways is an example.

56. In addition, DDD has engaged in a pattern and practice of fact-manipulation at the provider level. Providers such as Gateways and others are, in some circumstances, properly required to report "incidents" to DDD's Quality Assurance staff. The providers also are properly required to conduct their own internal investigations and make their own findings.

57. Recently, providers have been contacted by DDD staff, who *improperly* insist that the results of the providers' own investigations be changed to coincide with the position taken by DDD. In this way, DDD has tried not only to strip the providers of their right to *defend* against an allegation, but also their right to have a different *opinion* about it.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

[1] This section does not exist in the Rhode Island General Laws.

58. Not all clients are receiving 24 hour care. The scope of services that must be provided to a client is contained in his or her Individualized Service Plan. For many clients MHRH funds specific services for a limited number of hours per week.

59. It appears, however, that MHRH staff may claim "violations" by the licensee without regard to a client's Individualized Service Plan – as if the client were entitled to comprehensive 24-hour care regardless of limitations in the Individualized Service Plan – or limitations in state funding.

60. Furthermore, MHRH has summoned Gateways to meetings, but has insisted that Gateways attend without legal counsel. Based on information and belief, this practice is occurring with other providers as well.

61. Because MHRH's conduct has been outside of and in contravention of the regulatory and administrative processes, Gateways is without an adequate administrative remedy and is in need of the Court's injunctive and other relief.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**Count I**
**Declaratory Judgment**

We request that the Court enter a judgment declaring that –

- The "Notice of Show Cause Hearing" is null, void, and of no force or effect, as is every notice, instruction, order or demand issued within it or as a consequence of its issuance.
- Any so-called "in house" rules or regulations that have not been properly codified are null, void, and of no force or effect, as is every notice, instruction, order or demand contained within them, or issued as a consequence of their use.
- Any so-called findings, analyses or other opinions rendered by the MHRH staff, including its Quality Assurance staff, shall not be deemed conclusive on any issue adverse to a licensee without providing due process, including an opportunity to participate in an evidentiary hearing.

**Count II**
**Mandamus and/or Injunction**

We request that the Court enter a judgment and order requiring that –

- MHRH comply with its lawfully-adopted rules and regulations, including without limitation those that are applicable to license modification and revocation, and compliance orders.
- MHRH provide licensees with a lawfully sufficient due-process right to defend against any so-called findings, analyses or other opinions rendered by the MHRH staff, including an opportunity to participate in an evidentiary hearing.
- MHRH provide the licensee with notice in writing describing (a) the regulations that have been violated and (b) the portions of the Individualized Service Plan that have

not been fulfilled and (c) the specific conduct constituting the alleged violation, in each case where violations are alleged or compliance orders are entered, or staff findings or opinions are filed adverse to a licensee.

- MHRH cease and desist instructing licensees that they must not bring legal counsel to meetings with MHRH staff, or conditioning a meeting on the licensee's agreement not to involve counsel.
- MHRH cease and desist ordering licensees to alter their internal investigation records, including their internal findings or opinions as to any matter in issue.

**Count III**
**Due Process**

Pursuant to RIGL § 40.1-24-9, MHRH is authorized and required to adopt and enforce rules, regulations, and standards with respect to all facilities and programs licensed by MHRH.

Pursuant to DDD's own Regulations, a provider's license

> …will stay in effect until the Department takes action to revoke it and the agency has had due process.

Pursuant to RIGL § 40.1-24-7 (Denial, suspension, or revocation of license) –

> The department, *after notice and opportunity for a hearing* to the applicant or licensee, is authorized to deny, suspend, or revoke a license in any case in which it finds that there has been failure to comply with *the requirements established under this chapter*. The notice shall be effected by registered or certified mail or by personal service, setting forth the particular reasons for the proposed action and fixing a date not less than thirty (30) days from the date of the mailing or service, at which the applicant or licensee shall be given an opportunity for a prompt and fair hearing. On the basis of any hearing, or upon default of the applicant or licensee, the department shall make a determination specifying its findings of fact and conclusions of law. A copy of the determination shall be sent by registered or certified mail or served personally upon the applicant or licensee. The decision denying, suspending, or revoking the license or application shall become final thirty (30) days after it is so mailed or served, unless the applicant or licensee, within the thirty day period, appeals the decision to the superior court, pursuant to § 40.1-24-8. *The procedure governing hearings authorized by this section shall be in accordance with rules promulgated by the department.* A full and complete record shall be kept of all proceedings, and all testimony shall be reported but need not be transcribed unless the decision is appealed pursuant to § 40.1-24-8. A copy or copies of the transcript may be obtained by any interested party on payment of the cost of preparing the copy or copies. Witnesses may be subpoenaed by either party.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

In pursuing a licensing action against Gateways, the Department has (among other things) invented a new "Notice of Show Cause Hearing Process" which is unlawful and discriminatory. Gateways has been denied its right of due process of the law, in derogation of the statutes and regulations that govern MHRH's jurisdiction and authority; and in derogation of our rights under the Rhode Island and United States Constitutions.

**Count IV**
**Equal Protection**

To the extent that Gateways has been subjected to rules, regulations, processes and standards that have not been applied to other licensees, Gateways has been denied its right of equal protection, in derogation of the statutes and regulations that govern MHRH's jurisdiction and authority; and in derogation of our rights under the Rhode Island and United States Constitutions.

**Count V**
**Taking Without Just Compensation**

The actions of MHRH are an attempt to destroy or impair Gateways' interest in its licenses, and constitute a taking of private property without just compensation.

Gateways claim for damages is within the jurisdictional limit of the Superior Court.

*Wherefore,* we request that the Court enter such judgments, orders, and writs as are necessary and proper, together with an award of our costs of suit.

**Gateways to Change, Inc.,** by its Attorneys

**Richard G. Galli, Esq.** 1747
*Designated Trial Counsel*
224 Cindyann Drive
East Greenwich, RI 02818
Phone / Fax: 401 884 3215

**Gary R. St. Peter, Esq.** 1672
St. Peter & Kasle Incorporated
Four Richmond Square
Providence, RI 02906
Phone 401 4534330 / Fax 453 4333

**Certification**

I certify that I caused a copy of this document to be served upon Kathleen Spangler, Barry Hall, 14 Harrington Road, Cranston, RI 02920 by fax / first class mail / hand-delivery on the 24th day of February, 2005.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island