# Affidavit of Douglas Stone

1. My name is Douglas Stone. For seven years I was an employee of the Department of Mental Health, Retardation and Hospitals. My job title was "program planner" but I was assigned as an investigator in the Office of Quality Assurance until my resignation in June, 2005.

2. I have been asked to review and comment on some of the statements of "undisputed fact" contained in a Motion and supporting documents filed by MHRH in the US District Court lawsuit involving Gateways.

3. In its papers, MHRH has made unfair, untrue or inaccurate statements concerning Gateways' standing as a "similarly situated" provider, and as to the number or significance of "reports" that were received in the ordinary course of our work.

## Standing – similarity to other providers

4. MHRH has alleged that Gateways cannot be considered similarly situated to other providers.

5. Gateways holds licenses issued by MHRH, to provide supports within the Division of Developmental Disabilities (DDD). There are more than 30 similarly situated providers who hold licenses issued by MHRH to perform supports within DDD.

6. When MHRH claims that Gateways is "similar in scope" to nine other agencies – rather than to the whole group of licensees – MHRH is using a meaningless term. The concept of the "scope" of an agency has no meaning that I know of. The term "scope" has not, to my knowledge, ever been used within DDD to define or characterize any agency or group of agencies. There is no method that I am aware of by which DDD has ever before tried to subdivide or classify its licensed agencies according to their "scope."

## Reports – their use and misuse

7. The statute governing our work requires that certain defined incidents be reported. The licensing regulations go on to identify some incidents that are considered "serious."

8. The papers submitted by MHRH provide no useful information concerning how many reports were received, who filed them, whether they indicated any kind of wrongdoing, whether they were investigated, or what the results of the investigation might have been.

9. Gateways is a provider that operates in a self-reporting system. That means that most of the reports we received were in fact generated by the providers themselves – either their administrators or their staff.

10. When a provider files a report, that indicates in the first instance that the provider is doing its job.

11. MHRH has made no attempt to distinguish between reports submitted by providers and those submitted by others.

12. MHRH has alleged that Gateways was subject to more reports than other providers. Although the assertion is meaningless, it is also probably false.

13. I frequently attended the Incident Management Committee meetings and am confident that Gateways was not the agency with the highest number of reported incidents.

14. In our self-reporting system, we wanted providers to report, not to conceal. The fact that a report is received can be evidence of good things as well as bad. For example, if MHRH receives more reports this year than it did last year, it could mean that:

    - The provider has become more vigilant
    - The provider has become more willing to report marginal or doubtful events
    - The provider's internal reporting systems have become more mature
    - The provider's staff training has become more effective

15. The fact that a report has been received does not indicate that any wrong was done. Reports can be made anonymously -- by disgruntled employees, for example – without regard to their lack of merit.

16. On average, a provider could expect to have one Licensing review every two years. From Quality Assurance (surveys or investigations) an average provider could expect to receive an on-site visit no more than three or four times per year.

17. Gateways has been subject to on-site QA and Licensing visits at a rate many times higher than any other provider.

18. In my case, for example, since April 2004 I was ordered to make visits to Gateways at least fifteen times. I know some other members of the QA staff were also ordered to conduct many more visits to Gateways than to any other provider.

19. My orders concerning Gateways were given to me by the administrator of the Office of Quality Assurance. I believe that her orders to me were motivated at least in part by her desire to display a "show of force." She told me to treat Gateways differently than I had ever treated other providers.

20. For example, although I had never been ordered to observe training sessions or incident management committee meetings at any other provider (without the provider's invitation), the administrator ordered me to observe them at Gateways. She also prohibited me from letting Gateways know I was coming.

21. We were not being asked to evaluate Gateways in an objective manner. We were expected to investigate Gateways and find things that were wrong. We were expected to find proof to support the opinions that the administrator had already expressed to us.

22. I know that Gateways was treated differently than any other provider, and I know that the way we were required to treat Gateways caused unnecessary disruption.

23. I resigned from MHRH in large part because I was tired of the way the administrator was managing the Office of Quality Assurance. She exhibited no interest in collaboration. With her, it was "us versus them."

24. She was less interested in the outcomes of our work – protecting people from harm – than she was in the bare numbers that our work generated. Even the numbers were interpreted to suggest bad things rather than good things. If the number of reports went up, she would say it was proof that bad things were happening (instead of better reporting). If the numbers went down, she would say that providers weren't reporting enough.

25. I also resigned from MHRH because I had been involved in an investigation of possible mismanagement of funds on the part of a senior employee in the Office of Quality Assurance. In fact, I was assigned by A. Katheryn Power (the prior Director of MHRH) to

replace the employee as financial intermediary with an outside agency, as a consequence of the investigation.

26. After the preliminary results of my investigation were reported to Ms. Power, and shortly after I replaced the senior employee as the financial intermediary, Ms. Power left the state. Jane Hayward took over as acting Director. Because nothing much seemed to be happening with the investigation, I went to Kathleen Spangler (who was then chief of staff) and turned over my documentation on the investigation.

27. Ms. Spangler requested an audit by the Department of Administration, but no one interviewed me or even contacted me to discuss either my report or the evidence that I had gathered. Instead, I was told that the audit had been completed and that it found nothing more than "sloppy bookkeeping."

28. Thereafter, I had to continue reporting as an employee to the senior staff member, against whom I had filed my investigation.

29. Ms. Spangler never asked me to go over the information with her after I gave her my files, nor did she request me to participate in any meetings with the senior employee and the auditor.

30. An MHRH attorney who looked at my investigation materials also did an investigation of the matter, and told me that her report would concur with mine. She told me that if the department didn't take action, and her report became public later, they would look very foolish for not having taken any action. After Kathleen Spangler became acting Director, the attorney was re-assigned to a job at the Department of Administration in Providence.

31. By the time I left, I could no longer continue to work in a Department or a Division in which such a double standard was applied. We were holding agencies to a completely different standard than we applied to ourselves.

32. We were ordered to go out and look for anything bad we could find concerning agencies, yet when I handed the same kind of information on a silver platter to the department's chief of staff and director, it was dismissed without even involving me in the discussion, or considering the information I possessed.

33. I believe that the statistical and other information presented by MHRH in its Motion and supporting papers misrepresent the facts concerning Gateways' standing as a provider.

Douglas Stone

Subscribed and sworn to before me this 7th day of July, 2005

Notary Public